## INGA HOLLER v. MARIT AMODT.

### (153 N. W. 465.)

Contemplating death, one A. executed a bill of sale of his personal property and a warranty deed of his real estate, in favor of his wife. A few days later he executed a will, leaving all of the property, both real and personal, to said wife. After his death, one of the children brings this suit

Note.—That equity will impress the share of an heir, devisee, or legatee with a constructive trust because of his fraud in frustrating decedent's intention to give the property to a third person is the well-established rule. See notes in 8 L.R.A.(N.S.) 698; 31 L.R.A.(N.S.) 176; and 106 Am. St. Rep. 95. There is a conflict of authority, however, as to whether a constructive trust may be based upon an undertaking to hold for the benefit of another property received through devise or inheritance, where no actual testamentary intention has been frustrated and the element of personal fraud is wanting. The decisions pro and con on the question are collated in note in 33 L.R.A.(N.S.) 996.

against the mother, alleging that said property had been willed to the mother in trust, and praying that distribution be ordered.

**Bill of sale — warranty deed — made in contemplation of death — to wife — will later made — in favor of wife — suit by child — claiming property held in trust— distribution — complaint — amendment — motion for.**

1. At the close of the evidence, plaintiff moved to amend her complaint by striking out all reference to the bill of sale and deed. This was denied by the trial court, and, for reasons stated in the opinion, such denial was error. However, this court in trial anew will consider the complaint properly amended.

**Evidence — clear and convincing — must be — gift of property — by will.**

2. Evidence examined and *held* not of that clear and convincing character necessary to establish the trust alleged, but does show a gift of the property, by will, to the mother, without any restrictions whatever, and with the express desire upon the part of the father that his estate be kept together for the benefit of the family and the payment of the debts. That the father trusted the mother to sometime make a distribution of the property in no manner changes the absolute character of the gift.

Opinion filed June 3, 1915.

Appeal from the District Court of Bottineau County, *Burr,* J. Affirmed.

*John D. Scherer,* for appellant.

Where a will is made devising all the property to a person, with the intent of having this person distribute according to the rule of succession, and such person takes the property with knowledge of the intent of the testator, he holds it in trust for such purpose, and such distribution can be compelled. Gilpatrick v. Glidden, 2 L.R.A. 662, and notes, 81 Me. 137, 10 Am. St. Rep. 245, 16 Atl. 464.

*Bowen & Adams,* for respondent.

The execution and delivery of the bill of sale and the deed were wholly immaterial matters, and plaintiff was not entitled to amend the complaint to conform to such proof. Maclaren v. Kramar, 26 N. D. 244, 50 L.R.A.(N.S.) 714, 144 N. W. 85.

Where a person takes property by a deed, bill of sale, or by a will, with the agreement that she would transfer the same to the natural heirs of the deceased, she becomes a trustee at once upon failing to so transfer. 3 Pom. Eq. Jur. 3d ed. §§ 1053–1055, and notes; note to Cassels v. Finn, 106 Am. St. Rep. 95.

There must be, however, on the part of the trustee, or grantee, or devisee, a fraudulent agency in procuring the devise or grant. Gilpatrick v. Glidden, 81 Me. 137, 2 L.R.A. 662, 10 Am. St. Rep. 245, 16 Atl. 464.

BURKE, J. On April 14, 1911, Knute Amodt executed a certain warranty deed to his lands and a bill of sale of his personal property to his wife; on May 5, 1911, he executed a will whereby he devised and bequeathed the same property, real and personal, to his said wife. On May 14, 1911, he died, leaving besides his wife, aforesaid, seven children. The oldest, Inga, who is married, brings this action, setting up the aforesaid facts, and claiming that the transfer of the property by the deeds and bill of sale aforesaid, and the execution of the will, were pursuant to an oral agreement had between the father and mother and children, that said property be transferred to the mother with the understanding and agreement that she "would lawfully distribute his property among his heirs, according to the rule of succession." That the purpose of said Knute Amodt in making said transfers and in preparing and executing the will was to save his estate the cost of the probate court. The mother answers, admits that the execution of the deeds and bill of sale were without consideration, and disclaims any claim thereunder. She does, however, claim under the will, and denies that it was made pursuant to any agreement that she would distribute said property among the heirs, but alleges that she is the absolute owner of the property. Upon the trial of the action, the mother was called for cross-examination, and testified that her husband had been sick about six months before his death. That she knew nothing of the deeds or bill of sale.

She testifies:

Q. Did you say that he made a testament in regard to his property?

A. Yes. It was—he left everything to me and says I shall divide it myself.

Q. That is, he made a writing in regard to his property that you call a testament?

A. Yes. He said how he wanted it. . . .

Q. Now, was your husband in bed at that time he told what he wanted to go into this testament?

A. He was in bed. It was not very much he was able to be up all winter, but he was with his full senses until the last day.

Q. And was Mr. Thompson there at the time when he wrote this testament, as you call it?

A. Yes. He was in the room with Knute, and I was not asked about anything. Just told him to state it just the way he wanted it.

Q. Was there anybody else there beside Mr. Thompson at the time he—at the time it was written?

A. Yes, it was Hans Eikness and Conrad and Emil Jonsgaard and a boy that worked for us.

Q. And did Mr. Thompson write this writing up at that time?

A. Yes, he did.

Q. And after it was written up do you know if anyone signed it?

A. Yes, the witnesses.

Q. Did your husband also sign it?

A. He could not write, but made a cross; that was good enough.

Q. After this writing was made, what was done with it, if you know?

A. Knute said that Otis Thompson should keep it for us in his safe. That was all that was said and all the children were satisfied with it. . . .

Q. Do you know when it was that this writing was made?

A. No, I do not remember. It was some weeks before he died. I can't remember it. . . .

Q. Now, at the time when he made this writing, did he say anything about why he made this—what he made this writing for?

A. He said he did it because he wanted me to have it undisturbed.

Q. At the time that he made that writing, did he say anything about making it to save the costs of administration?

A. I did not hear that,—Otis will know about that; he heard it and I didn't,—he did it for the purpose that there should not be any strife about it.

Q. At the time that he made this writing did he say anything about turning the property over to you for you to distribute, instead of the court; at the time that he made this writing did he say anything that you divide this property instead of the court?

A. Yes, he did. . . . That was about all I heard. I was in the bedroom, and told him he could tell how he wanted it done.

Q. What did you hear him say about dividing up the property instead of the court?

A. I did not hear anything about that. I suppose it is in the testament.

Q. Did you hear him say anything about your dividing up the property among the children?

A. No, he said nothing about that.

Q. Well, what did you mean when you testified that the property was given to you for you to divide the property up among the heirs?

A. Well, then, can't I have it until I get ready to divide myself? . . . I can do it then when I am in a place to do it.

Q. You understood that you were to divide up the property; but that you might make the division when you saw fit?

A. Yes, I think it was so. . . . He owned what he had, and when he gave it to me then I supposed it would be mine.

Q. But when you took the property you understood that some time you would have to divide it up among the children?

A. Yes, I understood that; when Holler came out, I said she was to be the first one to have hers; but we were so much in debt that this year had to be taken care of first.

Q. And you took the property for the purpose of dividing it up afterwards at some time?

A. That is how I understood it.

Q. And you got that understanding you had from what you heard your husband say?

A. Yes, that is how I understood it. And he understood that I was the first one to receive it because I worked hard.

Q. And you thought in taking the property that you could divide it up right away if you wanted to, or you could wait a while before you made the distribution or division?

A. No, I thought I would try to divide it so that everybody would be satisfied, in a decent way.

Q. And you do intend to divide the property according to the wishes of your husband as he told you before he died?

A. Yes, of course, I have to divide it after a while; but we were

put back those hard years, but we try and do the best we can until we get that out of the way.

Q. And in dividing it you intend to give to each of the children the share that they would have under the law?

A. Yes. That is what I thought was best.

Q. And you want to do that because your husband asked you to do that before he died?

A. Yes.

Q. And you wanted to do that because he said so at the time he made his testament?

A. Yes, I mean to divide it.

Q. And in dividing it you don't mean to leave your daughter Inga out, do you, but you intend to give her a share also?

A. No, that is what I said to Mr. Holler. Can't he tell you that I said so?

Q. And your husband said he would leave his property to you this way if it was satisfactory to all of the children, did he not?

A. Yes, everyone said "yes" to that.

Q. And the children were all consulted in regard to it, and they were all satisfied?

A. Yes, those that were home.

Q. And because the children were all satisfied, is the reason that your husband left the property that way, is it not?

A. Yes, he said that he was satisfied to have it so. And they all were agreed to have it.

Q. The children all said that it was satisfactory with them for your husband to leave the property to you, did they not?

A. Yes, I should have it just as long as I wanted it. *They all said "yes" to that.*

Q. Then because the children were all satisfied was the reason that your husband left the property to you?

A. Yes, I think it was.

Q. And that is the way—and that was the talk between you about it?

A. Yes, and was well satisfied with it. And he was glad to be ready to go Home.

Q. And you told him that you would take the property as he wanted

you to take it, and that you would divide it among the children yourself?

. A. Yes, I have taken care of it, too.

Q. And the reason that you haven't made a division before this is because of the hard years and the failure of the crops?

A. Yes, of course it was; for two years we did not have anything, and we had doctor bills and funeral expenses, and we had no crop, and we had to take care of the funeral expenses.

Q. Ever since your husband died the property has not been in good shape for a division, has it?

A. No, not unless we borrowed at the bank, and that would be too expensive.

Q. And as soon as the property is in shape for division you intend to divide it as your husband requested you and as it was left to you?

A. Yes, that is the intention. The oldest she was first, that is what I said. That is what they shall have. . . .

She further testifies that all of the children were satisfied, with the exception of Inga, the oldest, this plaintiff. Other testimony was given by the witness, but we have set out the most important part. H. D. Eikness was called as a witness, and testified that he was present when the testament was written, but gave no testimony in any manner contradicting defendant. None of the other witnesses to the will were called, which is a circumstance, we think, tending to show that the testimony as given by the mother was substantially correct.

(1) The first question raised by the briefs relates to the ruling of the trial court in refusing to allow an amended complaint by striking out the reference to the deeds and bill of sale. The complaint on which the trial was had contained allegations both of the execution of the bill of sale and deeds and of the will. After defendant had been called for cross-examination, and had given the testimony aforesaid, denying all knowledge of the deed and bill of sale, plaintiff asked permission to amend the complaint by striking out all reference to the sale. Section 7478, Comp. Laws 1913, reads: "No variance between the allegation in a pleading and the proof shall be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits. Whenever it shall

31 N. D.—2.

be alleged that a party has been misled, the facts shall be proved to the satisfaction of the court, and in what respect he has been misled; and thereupon the court may order the pleading to be amended upon such terms as shall be just." Section 7479, Comp. Laws 1913, reads: "When the variance is not material as provided in the last section, the court may direct the fact to be found according to the evidence, or may order an immediate amendment without costs." Section 4780, Comp. Laws 1913, reads: "When, however, the allegation of the cause of action or defense to which the proof is directed is unproved, not in some particular or particulars only, but in its entire scope and meaning, it shall not be deemed a case of variance within the last two sections, but a failure of proof." Section 7482 reads: "The court may, before or after judgment in furtherance of justice and on such terms as may be proper, amend any pleading, process or proceeding by adding or striking out the name of any party; or by correcting a mistake in the name of a party, or a mistake in any other respect; or by inserting other allegations material to the case; or, when the amendment does not change substantially the claim or defense, by conforming the pleading or proceeding to the facts proved."

It will be noted that the utmost liberality is allowed as to amendments, *when the amendment does not change substantially the claim or defense.* Such has been the holding of this court from the earliest date. See Nashua Sav. Bank v. Lovejoy, 1 N. D. 211, 46 N. W. 411, where it is said: "It would have been within the discretion of the trial court, upon the hearing of such a motion, to have given plaintiff leave, with or without terms, to amend the summons by adding the omitted name thereto. Such discretion would not be reviewable. . . . Courts are created for the purpose of enforcing and protecting rights, not for the purpose of seizing technical and immaterial defects to defeat them. . . . Section 142 provides that 'the court may, before or after judgment, in furtherance of justice, and on such terms as may be proper, amend any pleading, process or proceeding by adding or striking out the name of any party, or by correcting a mistake in the name of a party, or a mistake in any other respect.' Section 145 provides: 'The court shall, in every stage of action, disregard an error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party, and no judgment shall be

reversed or affected by reason of such error or defect.' We think the case presented by this record clearly comes within the letter as well as within the spirit of the provisions of the sections of the Code above cited."

See Anderson v. First Nat. Bank, 5 N. D. 80, 64 N. W. 114, where this court said: "The plaintiff asked leave to amend his complaint to conform to such proof. Such an amendment is in furtherance of justice. To refuse to allow it is an abuse of discretion. Not a single reason can be adduced to support such denial. No possible prejudice could have resulted to defendant from the granting of it. Defendant could not have been surprised to its prejudice, as it did not then and does not now dispute the fact, the allegation of which plaintiff sought to incorporate in the pleading by the proposed amendment. In denying the application for leave to amend, the court debarred the plaintiff from recovering the amount due the plaintiff from defendant. To have granted the motion would have resulted in no prejudice or injustice to defendant. The denial of it resulted in great injustice to the plaintiff. . . . We are not confronted with the question whether a party can by amendment change his cause of action from contract to tort, as the amendment proposed, while showing a conversion, would have left the complaint still standing as a complaint on contract. . . . We do not think that the proposed amendment substantially changed the nature of the plaintiff's claim, within the meaning of § 4938, Comp. Laws, permitting courts to allow an amendment on the trial, to make the pleading conform to the proof. [Citing] Smith v. Savin, 141 N. Y. 315, 36 N. E. 338; Culp v. Steere, 47 Kan. 746, 28 Pac. 987; Spice v. Steinruck, 14 Ohio St. 213; Esch Bros. v. Home Ins. Co. 78 Iowa, 334, 16 Am. St. Rep. 443, 43 N. W. 229." Upon rehearing, at page 89 of the said reports, the court goes further into the powers of the trial court to grant an amendment, and says: "We will assume in this discussion that defendant's counsel is correct in his assertion that the proposed amendment showed that it was this remedy to which the plaintiff desired to resort. The mere fact that by this amendment the plaintiff sought to change his action from one at law to one in equity is by no means decisive against the power of the court to make it. Unlike a motion to amend by transmuting an equity into a law case, the granting of it does not deprive the

defendant of the right to a jury trial. When the action is transformed into an equity action, defendant has no right to a jury trial. . . . The power of the court to amend the complaint on the trial to conform to the proof is not so limited by the statute that it cannot be exercised where the amendment will change the action from law to equity. The language of the statute is that the amendment shall not 'substantially change the claim.' We do not think that the proposed amendment substantially changes the plaintiff's claim. The form of the action is altered. The recovery will be somewhat different. But both complaints rest ultimately upon the ownership by plaintiff of the notes in question. . . . It is to be noticed that the statute declares that, to cut off the power to amend to conform to the proof, it is not enough that the cause of action is different. The claim itself must be changed, and that, too, in a substantial way. If in substance the two claims—the one set forth in the original and the one embraced in the amended complaint—are the same, the power to amend on the trial to conform to the proof exists."

In Bigelow v. Draper, 6 N. D. 152, 69 N. W. 570, it is said: "The first point urged by the defendants is that the court erred in permitting the plaintiff, after the verdict, to amend the summons, complaint, and all the proceedings by adding the name of the Northern Pacific Railroad Company as a party plaintiff. The action was originally instituted in the name of the receivers of the company, such receivers having been appointed by the proper United States circuit court in foreclosure proceedings. . . . It is true that this amendment was not made until after verdict; but the corporation had practically been a party to the action before that time, and the amendment simply brought it formally upon the record in the case. No right of the defendants could possibly be prejudiced by such amendment. The defendants were fully heard on the two questions on which they were entitled to be heard,—the question of necessity, and the question of damages. . . . Our statute relating to amendments is very broad in its provisions. Rev. Code § 5297, Comp. Laws 1913, § 5853. If the amendment is in furtherance of justice, it may be made. To hold that the amendment we are discussing should not have been made would be to return to the highly technical and extremely rigid rules of the common law relating to procedure."

In Martin v. Luger Furniture Co. 8 N. D. 220, 77 N. W. 1003, it is said: "It is elementary that the granting or refusing to grant amendments to pleadings is a matter lying largely within the discretion of the trial court, but it is equally well settled that such discretion means a legal, and not an arbitrary, discretion. . . . The general rule governing the allowance of amendments to pleadings has been well stated by Chief Justice Sawyer, in Kirstein v. Madden, 38 Cal. 162, in the following language: 'From oversight of counsel, committed under pressure of business, pleadings are often defective. In such cases, when an offer to amend is made, at such a stage in the proceedings that the other party will not lose an opportunity to fully present his whole case, amendments should be allowed with great liberality.' In Hayden v. Hayden, 46 Cal. 334, the court say: 'Undoubtedly, courts should be liberal in allowing amendments, to the end that cases may be fully and fairly presented upon their merits, and that equal and exact justice may be done between the parties.' In the light of the well-established principles enunciated by these cases, it is difficult to understand upon what legal theory the application to amend the answer was denied. . . . The argument of counsel is that a suitor cannot be permitted to assume positions in a law suit which are directly antagonistic to each other, and that to allow this to be done would, in effect, be to countenance bad faith in a suitor. This position is certainly plausible, and, abstractly considered, is unassailable; but it may, we think, in this case, be answered in part by the fact—as disclosed by the answer—that defendants have not directly alleged that the memorandum embraces the arrangement made by the parties respecting the purchase of the furniture. . . . This request, as we have seen, clearly involved a radical change of front on the part of the defendants, but we are constrained to hold that this change does not necessarily involve bad faith on defendants' part."

See Finlayson v. Peterson, 11 N. D. 45, 89 N. W. 855, where the court says: "On September 28, 1897, an amended complaint was filed in the district court, which, in substance, embraced all the allegations of the first complaint, but omitted the allegation that the defendant unlawfully entered upon the land and ousted the plaintiff thereof. In the amended complaint the following facts not contained in the first complaint were, in substance, set out, viz.: That the supreme

court had decided that the attempted foreclosure was abortive. . . . This new complaint further alleged that the defendant, since taking possession of the land, had leased the same to one Allison. . . . It was further averred that the rents, issues, and profits arising from the land had much more than met and discharged the mortgage debt and the taxes upon the land. . . . In this complaint, the plaintiff asked for an accounting in equity. . . . Counsel contended that the original complaint stated a cause of action in ejectment, and that the amended complaint alleged a cause of action for an accounting in a court of equity; and counsel contend, under an established rule of practice existing in the Code states, as well as in the states having no Code of Civil Procedure, that this is not permissible. There is good authority for this proposition of law, and we shall, at least for the purposes of this case, assume its entire correctness as stated by counsel. We are therefore to consider whether the amended complaint is obnoxious under this rule of practice. We think it is not. It lies within the discretion of the district court, either before or after judgment, to allow an amendment of a pleading in furtherance of justice, if the proffered amendment does not 'change substantially the claim or defense.' Rev. Codes 1895, § 5297, Comp. Laws 1913, § 5853. The question is, therefore, whether the facts averred in the amended complaint do substantially change the plaintiff's claim or cause of action as stated in her original complaint. As this court construes the two pleadings, the plaintiff's claim against the defendant, as presented in the two complaints, is substantially one and the same claim. It is certainly clear that a large and substantial part of the relief which a court of equity could lawfully grant the plaintiff under his first complaint could be granted with equal propriety upon the facts set out in the amended complaint. The facts pleaded in both complaints, if established, would entitle the plaintiff to relief in a court of equity as follows: First, to a decree quieting title in the plaintiff, and excluding the defendant from claiming title to the premises; second, to a decree canceling the foreclosure sale, and the certificate and deed issued pursuant to such sale; third, to a decree canceling the warranty deed from James Milne to the defendant; and, finally, to a judgment awarding the plaintiff the possession of the land. The facts pleaded in both complaints, without doubt, invoke the powers of a court of equity; and, being in a court of

equity, that court would retain jurisdiction of the case for all purposes.
. . . But the two complaints differ in this: In the first it was al-
leged, in terms, that the defendant took possession of the premises
unlawfully, and ousted the plaintiff therefrom; but this statement was
qualified in the first complaint by an averment to the effect that the
defendant claimed to be the owner of the land under the foreclosure
sale, and the deeds of conveyance executed pursuant to such sale. We
think that these two statements, when fairly construed, amount only
to the allegation that the defendant entered upon the land in good faith
as owner, but that he was mistaken as to his ownership, because the
foreclosure under which he claimed title was illegal and abortive. It
was not alleged in the first complaint that the defendant obtained
possession by force, nor is it claimed in any of the plaintiff's pleadings
that defendant obtained possession otherwise than peaceably. In the
second complaint, the allegation that the defendant entered unlawfully
and ousted the plaintiff is omitted, and in lieu thereof the plaintiff
alleges only that the defendant was in possession of the premises; and
by this complaint the defendant did not attempt to characterize the
defendant's possession, or attempt to allege, in terms, whether the same
was or was not lawful or wrongful; but, on the other hand, after stat-
ing the facts, the plaintiff prayed for an accounting, and for general
relief in equity. . . . Our conclusion is, therefore, that the trial
court properly denied the defendant's motion to strike out the amended
complaint."

See also Satterlund v. Beal, 12 N. D. 122, 95 N. W. 518; McLain
v. Nurnberg, 16 N. D. 144, 112 N. W. 243; Webb v. Wegley, 19 N. D.
606, 125 N. W. 562, wherein it is said: "Our statute . . . per-
mitting amendments of pleadings is very liberal in favor of such
amendments. . . . If an amendment is in furtherance of justice,
it may be allowed. Trial courts are vested with a broad judicial dis-
cretion regarding the subject of the allowance of amendments, and it
is firmly established that an appellate court will not interfere with
the action of the trial court, except in cases of a clear abuse of dis-
cretion. . . . From the record in the case at bar we are not prepared
to say that the trial court abused its discretion in permitting the amend-
ment complained of, although no showing of cause therefor was made.
The original answer, while inartistically framed, clearly shows on its

face that defendant did not intend to admit liability, as numerous alleged defenses are attempted to be pleaded. In deciding this point, as above indicated, we find ample support in the authorities."

See also Barker v. More Bros. 18 N. D. 82, 118 N. W. 823, wherein it is said: "The answer is, in effect, a general denial. The record shows that there was a misunderstanding at the trial as to whether an amended answer had been served. After such misunderstanding had developed, the defendants asked leave to interpose and file an amended answer, and leave was granted to file the same. This amendment was objected to, and the objection is still insisted on. The additional fact sought to be pleaded in the amended answer is that plaintiff assigned all his interest in the contract to them for a valuable consideration, on November 7, 1902, by an instrument absolute in terms, and that it was expressly agreed and understood between the plaintiff and these defendants at that time that the assignment was absolute in terms, and not as security. . . . On the appeal, the plaintiff's contentions are: (1) That it was error to permit the defendants to interpose the amended answer. . . . In reference to the action of the trial court in permitting an amended answer to be served, we think there was no abuse of discretion, and that the plaintiff was in no way prejudiced by the amendment. The complaint alleged that the assignment to Cooper was for security purposes only. The original answer expressly denied that there was any trust relation created by that assignment, and under that allegation and denial it would not have been error to admit proof that the assignment of November 7, 1902, was not a conditional one. However, disregarding entirely the question of the sufficiency of the original answer, we discover no reason why it was prejudicial or erroneous to permit the amendment to be filed to conform to the proof. It was not a different or new defense from that which was foreshadowed by the general denial or answer, wherein there was an express denial of any trust relation growing out of the assignment. The amended answer alleged that fact in more specific terms. The plaintiff did not ask for time to present additional evidence by reason of the amendment, and there was no showing or claim of surprise. The amendment was permissible and directly within the provisions of § 6883, Rev. Codes 1905, § 7482, Comp. Laws 1913. The amendment did not substan-

tially change the defense. A wide discretion is reposed in trial court in allowing amendments."

This is also the holding of a long line of authorities in our sister state of South Dakota upon the identical statute, beginning with Kelsey v. Chicago & N. W. R. Co. 1 S. D. 80, 45 N. W. 204, where it is said: "The modern rule, and the generally prevailing principle to-day, is that all such amendments shall be made as may be necessary for the purpose of determining the real question or questions in controversy between the parties, and administering justice. Under the Code, the utmost liberality prevails upon the subject of amendments of pleadings. The power of a court to allow an amendment of a pleading on a trial is expressly conferred by § 4938, Comp. Laws, which is as follows: [citing statute identical with ours]."

See also the case of Miller v. Perry, 38 Iowa, 301, wherein the supreme court says: "Under the statute it is the rule to allow amendments to pleadings. To refuse is the exception. The right to amend is not an absolute unconditional one, but is to be allowed in furtherance of justice under a sound discretion. Amendments, within the limits of the statute, should always be allowed when substantial justice be thereby promoted, and they should not be refused so as to operate a denial of justice." See also Gans v. Beasley, 4 N. D. 140, 59 N. W. 714; Kerr v. Grand Forks, 15 N. D. 294, 107 N. W. 197; Morgridge v. Stoeffer, 14 N. D. 430, 104 N. W. 1112; Rae v. Chicago & St. P. R. Co. 14 N. D. 507, 105 N. W. 721.

The case of MacLaren v. Kramar, 26 N. D. 244, 50 L.R.A.(N.S.) 714, 144 N. W. 85, is not contrary to these decisions nor the rules which we have been reciting, but under the peculiar facts in that case it was held that the amendment proposed introduced a *substantially different defense.* The holding in MacLaren v. Kramar is in harmony with the text stated at 31 Cyc. 452, wherein it is said: "There is a wide difference between a variance such as may be cured by an amendment, and a total failure of proof. If the divergence between allegation and proof is total, so that the cause of action or defense as proved is another than that set up in the pleading, then obviously there is no room for amendment, and a dismissal of the complaint or rejection of the defense is the only course open to the court."

With the law as above outlined in mind we turn to the case at bar.

In her complaint, plaintiff alleges the execution of the deed and bill of sale, and also of the will. Her amended complaint was identical in all respects with the first one, excepting that she withdrew the allegation regarding the execution of the deed and bill of sale. This was not the substitution of a new and different cause of action, but rather the narrowing of her allegations. The defendant was in no way prejudiced nor surprised. It was therefore the duty of the trial court to allow the amendment in the interests of justice. However, this is not important in view of the fact that we have before us the amendment, and as appellant demands a trial anew in this court the same will be tried upon said amended complaint.

(2) Assuming, then, that the amended complaint is properly before us, we reach the consideration of whether the evidence is sufficient to sustain the finding of the trial court, that there was no understanding or agreement had between the said Knute Amodt and the defendant that the said defendant should distribute the property belonging to his heirs after his death. There is absolutely no testimony in the record excepting that of the defendant herself, and from it we learn that the father, before his death, told defendant that he left everything to her, and that she should divide it herself. That the time and circumstances under which she should divide the property were left entirely to her. That the father understood that the mother was the best one to receive it and keep it together and do the best that she could until the debts were paid. We think that an analysis of the testimony will show that the father intended to give the property outright to the mother; that he relied upon her to take care of the family with the proceeds of his estate; and as occasion required give to each child some portion of the same. It is very evident that he did not wish it immediately divided, as he could have attained this result by making such disposition in the will. There is nothing in the argument that it was willed to the mother to save expenses; the expenses were just as great in the methods chosen as though he had himself made the division. The father undoubtedly believed that owing to the mother's age, she would not need the property a great many years. He also realized that it was for the best interests of the family that the children should be kept together, for a time at least, and that the property be used in its entirety for the support of the family and payment of the debts. The

fact that he trusted the mother to eventually redistribute the property, with justice to all of the children, does not change the absolute character of the grant. It was no restriction upon her title. That he trusted her to use the property according to his wishes, and to eventually distribute the same in a like manner, has nothing to do with the outright gift. The will is absolute. The burden is upon the plaintiff to show by clear and convincing evidence that there existed a trust of the nature claimed, and this burden she has not met. The trial court therefore was clearly right, and the judgment is affirmed.