**Leo Roy RIEGER, Plaintiff and Appellant,**

v.

**Francis RIEGER, Defendant and Respondent.**

**No. 8591.**

Supreme Court of North Dakota.

Feb. 18, 1970.

Rehearing Denied March 10, 1970.

William R. Mills, Bismarck, for plaintiff and appellant, Jack R. Christensen, Bismarck, on oral argument.

Duffy & Haugland, Devils Lake, for defendant and respondent.

ERICKSTAD, Judge.

The plaintiff, Leo Roy Rieger, appeals from a judgment of the District Court of Benson County dated August 30, 1968.

Leo initiated this action by a complaint dated October 12, 1965.

In paragraph I of the complaint, he describes 480 acres of land in which he contends he has an estate or interest. This is the same land as described in paragraph III(A) of the complaint.

In paragraph II of the complaint, he asserts that Vincent Rieger died intestate on or about May 5, 1954, in Benson County, North Dakota, possessed of and owning certain real estate totaling 960 acres which he, Leo, describes, together with other properties, and that, as a son and heir of Vincent, he had an interest in the same.

In paragraph III of the complaint, he asserts that on the 17th of November, 1954, he executed and delivered a quitclaim deed conveying all his right, title and interest in the real estate of the Vincent Rieger Estate and that on the same date he assigned all of his interest in the Vincent Rieger Estate to Francis, and that in consideration of the conveyance of the real estate interest and the assignment, Francis promised:

(A) That for so long as the said Francis Rieger lived the plaintiff could continue to possess and farm and enjoy the real estate premises then in his possession and described as the NW ¼ of Section 33; SW ¼ SW ¼ of Section 28; SE ¼ SW ¼ of Section 28; W ½ SE ¼ of Section 21; NE ¼ SW ¼ of Section 21; W ½ NW ¼ of Section 27; NW ¼ SW ¼ of Section 27, Township 153, Range 71, Benson County, North Dakota, provided that one-fourth the crop therefrom be delivered or paid over to her, and,

(B) That she would convey to plaintiff the premises described as the NW ¼ of Section 33; SW ¼ SW ¼ of Section 28, Township 153, Range 71, Benson County, North Dakota, but subject to her right to receive one-fourth the crop from same for so long as she should live.

In paragraph IV of the complaint, he asserts that he has been in possession of the 480 acres described in paragraph III(A) since May 5, 1954, except for the SE ¼ SW ¼ of Section 28 and the SW ¼ SE ¼ of Section 21, which Francis has wrongfully occupied since 1961, and except for the W ½ NW ¼ of Section 27 and the NW ¼ SW ¼ of Section 27, which Francis has wrongfully occupied since 1964.

In paragraph V of the complaint, he asserts that Francis, pursuant to an agreement with him, agreed that he should farm the 480 acres on the basis set out in paragraph III(A) and (B), and that Francis entered into a final contract with him as a memorandum of such agreement.

A further assertion of paragraph V reads as follows:

* * * it being understood and agreed between the parties that plaintiff by relinquishing his share of the estate to defendant was to have the exclusive right to farm the said premises during defendant's lifetime although the said farm contract was for a term of five years, and that plaintiff was to share equally in defendant's estate at the time of her death.

In paragraph VI of the complaint, Leo sets forth the descriptions of the property which he contends Francis transferred, leased, sold or divested herself of, and in addition asserts that Francis has established interests by will or other devise affecting her estate which will deprive him of his share of her estate upon her death.

In paragraph VII of the complaint, Leo asserts that Francis continues to dispossess, deprive and divest him of parts of the 480 acres described in paragraph I without regard for his interest therein.

In paragraph VIII of the complaint, Leo asserts that he has been deprived of the use and enjoyment of premises previously described and "of an undetermined amount of property [to] which he legally is entitled as an eventual heir of defendant."

His prayer for relief follows:

1. That plaintiff be declared to be the owner of the premises described as the NW ¼ Section 33; SW ¼ SW ¼ of Section 28, Township 153, Range 71, Benson County, North Dakota.

2. That the plaintiff be declared to have an estate for the life of Francis Rieger in the premises described as the NW ¼ of Section 33; SW ¼ SW ¼ of Section 28; SE ¼ SW ¼ of Section 28; W ½ SE ¼ of Section 21; NE ¼ SW ¼ of Section 21; W ½ NW ¼ of Section 27; NW ¼ SW ¼ of Section 27, Township 153, Range 71.

3. That title be quieted in the plaintiff and that the defendant be debarred from asserting any claim superior to that which she actually owns.

4. That defendant render an accounting of monies received from the premises she divested plaintiff of and a money judgment be awarded plaintiff for three times the net income amount derived therefrom.

5. That defendant render an accounting of the net proceeds of property and money inherited from the Vincent Rieger Estate and order defendant make provision protecting plaintiff's proportionate share thereof.

6. That the plaintiff be awarded his reasonable and actual attorney fees for this action against the defendant and that he have such other general relief as to the Court may seem just together with costs and disbursements.

In her answer, Francis denies every allegation of the complaint except those admitted, qualified or explained. She admits that Leo at one time had a remainderman's interest in the NW ¼ of Section 33 and the SW ¼ SW ¼ of Section 28 and that she owns a life estate in that property; she further admits that Leo owned an interest in the land described in paragraph II of his complaint at the time of Vincent Rieger's death; she denies every allegation of paragraph III of the complaint except that which asserts that on the 17th of November, 1954, Leo executed a quitclaim deed of his interest in the estate property to Francis and that on the same date he executed and delivered an assignment relinquishing all of his interest in the Vincent Rieger Estate to Francis; she further asserts that those instruments were executed and delivered by Leo to her in consideration of her conveyance to him of a remainderman's interest in the NW ¼ of Section 33 and the SW ¼ SW ¼ of Section 28, in which she reserved a life estate; she admits that the 480 acres claimed by Leo was leased by her to Leo for a period of time, but alleges that since November 1, 1961, he has had only a tenancy interest in the NW ¼ of Section 33 and the SW ¼ SW ¼ of Section 28 and no interest in the rest of the 480 acres; she asserts that she caused to be served on Leo a notice to quit the SE ¼ SW ¼ of Section 28, the W ½ NW ¼ and the NW ¼ SW ¼ of Section 27 and that he did quit said premises and has not been in the possession of those premises since November 1, 1961. In her prayer for relief, Francis asks that Leo receive nothing by way of his complaint.

The District Court, sitting without a jury, heard this case on March 13, 1968. On August 26, 1968, the court issued its memorandum opinion and on August 29, 1968, it issued its findings of fact, conclusions of law and order for judgment. From the judgment entered pursuant thereto, Leo appeals. He demands trial de novo in this court.

The pertinent parts of the findings of fact and conclusions of law of the trial court read as follows:

## FINDINGS OF FACT

### I.

That Vincent Rieger, the father of the plaintiff and the husband of the defendant, died in August 1954, leaving surviving him his wife, Francis Rieger, and seven children, to-wit: John Rieger, Rochus Rieger, Theresa Thompson, Agatha Zacher, Gloria Young, Marie Vetter and Leo Roy Rieger, the plaintiff herein; that at the time of his death the said Vincent Rieger owned 939 acres of land and the defendant Francis Rieger owned 500 acres of land.

### II.

That pursuant to mutual agreement of the heirs, the children conveyed to their mother all of their right, title and interest in and to the estate of the said Vincent Rieger and the defendant Francis Rieger gave to the several children a remainderman's interest in said land subject to a life estate in the said Francis Rieger, and gave to certain children certain personal property to balance the division among the children, and that pursuant to this agreement the plaintiff, together with John Rieger, Rochus Rieger and Agatha Zacher, did on the 17th day of November, 1954, convey to the defendant Francis Rieger the West Half of the Northeast Quarter, the West Half of the Southeast Quarter, the Northeast Quarter of the Southwest Quarter and the Southeast Quarter of the Southeast Quarter of Section Twenty-one; the Southwest Quarter of the Southwest Quarter of Section Twenty-seven; the East Half of the Northeast Quarter, the Northwest Quarter of the Northeast Quarter and the South Half of the Southwest Quarter of Section Twenty-eight, and the Northwest Quarter of Section

Thirty-four, and the North Half of Section Thirty-three all in Township One Hundred Fifty-three North of Range Seventy-one West of the Fifth Principal Meridian, and that the other children likewise conveyed their interest in the Vincent Rieger estate and properties to the said Francis Rieger and she thereupon became the owner of the land theretofore vested in the Vincent Rieger estate, as well as that which was vested in her individual name.

### III.

That on the first day of November 1956, the plaintiff and the defendant entered into a farm contract whereby the plaintiff leased from the defendant the following described property, to-wit: the Northwest Quarter of Section Thirty-three, the South Half of the Southwest Quarter of Section Twenty-eight, the West Half of the Southeast Quarter of Section Twenty-one and the West Half of the Northwest Quarter and the Northwest Quarter of the Southwest Quarter of Section Twenty-seven, all in Township One Hundred Fifty-three North of Range Seventy-one West, for a period of five years, on the usual one-fourth share of the crop to the defendant and three-fourths share of the crop to the plaintiff, such lease terminating on November 1, 1961.

### IV.

That pursuant to various actions taken by the remaindermen and notice from the defendant, the said lease was terminated as to all of the land except the Northwest Quarter of Section Thirty-three and the Southwest Quarter of the Southwest Quarter of Section Twenty-eight in Township One Hundred Fifty-three North of Range Seventy-one West, that being the land in which the plaintiff had a remainderman interest, and that he surrendered possession of all the rest of the land but has continued to farm the land so owned by him as a remainderman.

### V.

That the plaintiff has claimed certain oral agreements with the defendant relating to the leasing of all of the land covered by the lease agreement of November 1, 1956 but that such alleged oral agreements are in conflict with the provisions of the deed of November 17, 1954 and the said lease of November 1, 1956 and are therefore wholly invalid, if in fact any such oral agreements were made.

### VI.

That the plaintiff has asserted an oral agreement on the part of the defendant to leave him certain properties by her Will but that any such claim is premature until after the death of the defendant.

### VII.

That the plaintiff has a remainderman interest in and to the Northwest Quarter of Section Thirty-three and the Southwest Quarter of the Southwest Quarter of Section Twenty-eight in Township One Hundred Fifty-three North of Range Seventy-one West, subject to a life estate therein in favor of the defendant and that he has continued to farm the same under a continuance from year to year of the lease of November 1, 1956 as to said premises.

From which findings of fact, the Court deduces the following

### CONCLUSIONS OF LAW

### I.

That the plaintiff is the owner of the title in fee to the Northwest Quarter of Section Thirty-three and the Southwest Quarter of the Southwest Quarter of Section Twenty-eight in Township

One Hundred Fifty-three North of Range Seventy-one West, subject to a life estate therein in favor of the defendant Francis Rieger.

## II.

That the plaintiff is entitled to no other or further relief in this action and that all of his other claims and demands are dismissed with prejudice.

## III.

That no costs shall be awarded to either party in this action.

On appeal Leo asserts that there are four issues for this court to determine. He frames the issues as follows:

1. Is the plaintiff entitled to a decree establishing a fee simple title to the NW ¼ Sec. 33 and the SWSW 28, T153, R71 Benson County, North Dakota, subject to the payment of one fourth of the crops to the defendant for her lifetime?

2. Is the plaintiff entitled to a decree establishing his right to share equally with the other children in the defendant's estate?

3. Is the plaintiff entitled to a decree establishing his right to farm the following land in Township 153, Range 71, Benson County, North Dakota, for the life of the defendant:

NW ¼ 33

SW ¼ SW ¼ 28

SE ¼ 28 [Apparently a typographical error for a description which should read SE ¼ SW ¼ of Section 28.]

W ½ SE ¼ 21

NE ¼ SW ¼ 21

W ½ NW ¼ 27

NW ¼ SW ¼ 27

4. Is the plaintiff entitled to damages for breach of the agreement of the right to farm the land listed above?

Our view is that all four of the stated issues must be answered in the negative.

Our analysis of the testimony is that before Vincent died he and his wife, Francis, executed deeds dividing farm land owned in individual capacities among their children on the general basis that each child was to receive 200 acres of land or its equivalent in value upon the deaths of both parents. Those deeds were found in Vincent's safe in the home of Francis and Vincent upon Vincent's death.

It seems to be agreed that at the time of Vincent's death he owned approximately 900 acres and Francis owned about 500 acres of farm land. Since Vincent died intestate, had the heirs shared in his estate according to the law of succession, Francis would have been entitled to ⅓ of the 900 acres, or 300 acres, and each of the seven children would have been entitled to approximately 85 acres. (An examination of the inventory filed in Vincent's estate discloses 960 acres of farm land; joint United States Government bonds, which none of the children could claim, totaling $9,140 in value as of date of death; and personal property of the value of $9,932.66.)

It appears that each of the seven children assigned all of his or her interest in the father's estate to the mother and that each received, following the probate of the father's estate, a deed to certain land subject to a life estate in the mother. The record shows that Leo executed his assignment and quitclaim deed on November 17, 1954, and that he acquired a deed to the SW ¼ SW ¼ of Section 28 and the NW ¼ of Section 33, subject to his mother's life estate, on January 13, 1955.

Since none of these documents gives Leo the rights he contends he has, his rights, if any, must be established through an oral agreement and for evidence of that we must examine the testimony taken at the trial.

Leo testified that prior to Vincent's death, Vincent and Francis visited him in his home on the farm, at which time Vincent laid a deed on the table and said, " *  *  *

here is your deed, this is home farm, from now on you are going to have to keep the place up or make the improvements."

Francis has had very little formal education and seemed to have considerable difficulty understanding the questions asked by Leo's counsel, and although during the early part of her cross-examination it appeared that she was admitting that she had been present when Vincent showed Leo the deed conveying the NW ¼ of Section 33 and the SW ¼ SW ¼ of Section 28 to Leo, during the latter part of the cross-examination she definitely denied having been present when any of the children were shown any of the deeds.

Leo further testified that after his father's death, when the children and their mother were together, Mr. Haugland told them that if they would turn their interests over to their mother that he would make out a life-term farm contract so that they could farm the land they were then farming. At the time of Vincent's death, Leo was farming 480 acres, 200 of which was described in the deed shown him by Vincent and was the same in which he later acquired a remainder interest from Francis. He said, however, that a few days later he was required to meet with the other heirs again because Rochus refused to join in the assignment to their mother and her appointment as administratrix unless he could farm 40 acres of the land that was then being farmed by Leo.

He further testified that after the estate was probated he received a deed from Francis to the NW ¼ of Section 33 and the SW ¼ SW ¼ of Section 28, which reserved a life estate in his mother; whereas, the agreement was that she was to receive only a one-fourth share of the crop from those 200 acres each year during her lifetime.

Leo further testified, in effect, that through Francis's breach of her oral agreement he was deprived of the right to farm the NE ¼ SW ¼ of Section 21 in 1954, the SW ¼ SE ¼ of Section 21 and the SE ¼ SW ¼ of Section 28 in the year 1961, and the W ½ NW ¼ and the NW ¼ SW ¼ of Section 27 in 1963 or 1964, and the NW ¼ SE ¼ of Section 21 in 1965, so that at the time of the lawsuit he was farming only 200 acres of the land formerly owned by his father.

Mrs. John Rieger testified that either at her house or at Francis's house when the heirs were present with Francis that Francis, in substance, said: " * * * that they would sign all interest back to her, she would never make any changes, everything would stay the same as it was."

Mrs. Leo Rieger testified that Francis said, "Time and time again," that she "just wanted everything to stay as it was before Leo's dad had died."

Theresa Thompson, formerly Theresa Rieger, testified, in effect, that she had received a letter from Mr. John C. Haugland dated November 24, 1954, in which he explained the circumstances under which the heirs were to convey their interest in their father's estate to their mother and receive in return certain property. In her case she was to receive 80 acres, subject to a life estate in her mother, plus $2,000 in bonds on her mother's death. She testified that this letter was addressed to her, as Theresa McIntyre, and to her sister, Miss Gloria Rieger, while they lived at Santa Clara, California, and that she received this letter sometime shortly after November 24, 1954. This letter did not contain a provision assuring anyone that the land would be rented for the rest of Francis's life on the same basis as during Vincent's life. Its reference to rental arrangements was for the "present time."

Agatha Zacher, formerly Agatha Rieger, testified that the letter was a fair representation of what took place at her mother's home at the time of the conference with the heirs. She further testified that the agreement was that each of the children had the right to farm the land that was assigned to him.

Rochus Rieger testified concerning the agreement as follows:

A. Well, first understanding was there was no will and we had appointed mother as administratrix. After we agreed on her to be administratrix, and at time it was told us that we could follow the pattern dad had set up, or that we could sell, have the land sold, had right to 89 acres, or it had to be sold at hundred dollars, or mother said if we follow dad's pattern, and we all agreed would get 200 acres instead of 89 acres, which is stated in these letters. Another thing I want to point out at this time, at the time of dad's death it was said things keep going until fall and until we got probated, and land was farmed the same then with the exception between me and Leroy, he was supposed to get 40 acres of land deeded to me. Leroy let me on that. In the fall, this November when we settled this deal, it was set up and said each child has right to farm own land, was especially specified to John Haugland, the attorney.

Q. Was there anything said about farming other land than own?

A. Only if the child owned this land did not want to farm, then mother could lease to one of the other children, but no outsiders could get farm land—it had to be farmed by us children.

On cross-examination, Rochus conceded that if Leo prevailed in court that he, Rochus, would lose the use of 38 acres, the Zachers would lose the use of 120 acres, and Marie would lose the use of 40 acres for the period of Francis's life.

Christine Rieger, Rochus's wife, testified that she was present at all of the conferences held by the members of the family. She said the understanding was that each was to receive his own deed and farm his own land subject to Francis's life estate. Part of her testimony follows:

A. They was supposed to receive own deed and that was it, and can farm it, their own 200 acres and that was it.

Q. They were to get title to 200 acres apiece except John got 240 because of condition of land, approximately 200 acres each, they were each to get subject to your mother-in-law's life estate?

A. Yes.

Q. And then was there something said in regard to who was going to farm this land?

A. Yes, whoever's land it was and themselves, they were to farm. Theresa wasn't there, and Marie wasn't married yet, and Gloria, so if they wanted to farm it they can come back and farm it, take her land and farm it if they wanted to.

Q. And if they didn't want to what was going to happen?

A. Well then mother, Mrs. Rieger, could have say, if it was not theirs, for the girls' part.

She also said that Leo was given a five-year contract so that he might borrow money from FHA to build a quonset building.

Rochus further testified that in 1955 he made a trip to California, at which time he saw the letter of 1954 sent by Attorney Haugland to his two sisters in California, and that the letter was a fair representation of what had taken place at the conference of the heirs following his father's death.

Marie Vetter testified concerning the agreement among the heirs as follows:

A. Well, they agreed that each one should be entitled to farm the 200 acres of land. Since I was not married at the time I asked Haugland if that agreement would state that at time I got married if I would have right to claim my 200 acres of land and farm it, and it was so stipulated.

Q. And was there anything said at any of those meetings that anybody could— that anyone of the family would have

the right to farm any amount of acres outside of the 200 forever?

A. No, only the 200 acres they were entitled to, that was owned in their names in the. deeds.

On direct examination Francis Rieger testified in part as follows:

Q. You have a right legally to rent it to whom you pleased. Was there conversation that you were going to rent that 200 acres to the people that had the legal title to it?

A. Yes, each one can chose to farm own land, 200 acres.

Q. And was there anything said that you were going to rent any of the rest of the land to any of the boys for all time?

A. No.

Q. You said any of the boys could rent it, how about the girls?

A. Yes, they have the right to rent if they want to, yes, that's the agreement.

Q. That's what they were told at time you had conference?

A. Yes.

Q. That if the girls wanted to come back and farm, okay they could. If they did not want to farm then would rent to somebody else, that the idea?

A. That's right.

Q. And a couple of years later, in 1956, you did rent the 200 acres to Leroy, that he was going to get, and some of the land that belonged to the girls who did not care to come back and farm, for a five-year period?

A. Yes.

Q. Was there anything said about renting this land for a longer period than five years?

A. No, just five years.

John Rieger testified to the effect that his mother stated at the conferences of the heirs that she would make no changes. Part of his testimony follows:

Q. Did your mother make any expression as to what was going to be procedure after those deeds were signed?

A. Yes, she said would be no changes made.

Q. No changes at all?

A. Not selling any land or changing things, tenants or anything.

■ When there is no dispute in the testimony and this court is required only to arrive at conclusions from the facts, the task is difficult enough; but when, as here, the testimony is in conflict, the task becomes almost impossible. It is for this reason that this court has adopted the rule that on trial de novo this court will give the findings of the trial court appreciable weight, especially when the facts are based upon the testimony of witnesses who appeared before the trial court. Watson v. Kresse, 130 N.W.2d 602, Syllabus ¶ 1 (N.D. 1964); Renner v. Murray, 136 N.W.2d 794, 797 (N.D.1965).

In the instant case we are confronted with questions concerning what evidence we may consider.

Issues numbered 1, 3 and 4 involve an attempt to establish an oral contract, to require specific performance of it or impose a trust upon land because of it, and to collect money damages for the breach of its terms.

The first question involves the relevancy of our Statute of Frauds. The parts pertinent here read:

9–06–04. Contracts invalid unless in writing—Statute of frauds.—The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by his agent:

1. An agreement that by its terms is not to be performed within a year from the making thereof.

\* \* \*

4. An agreement for the leasing for a longer period than one year, or for the sale, of real property, or of an interest therein. \* \* \*

North Dakota Century Code.

Leo cites 49 Am.Jur. Statute of Frauds § 30 at 391 as his authority for his contention that an agreement contingent on the life of a person is not within the Statute of Frauds, because by the death of the person within one year a valid performance may be had within that time.

■ Whether the alleged oral contract to lease the 280 acres for life and to convey the 200 acres to Leo subject to Francis's right to one-fourth of the crops from the 200 acres for her life comes within the Statute of Frauds we need not decide in this case, for after the alleged oral contract was made the parties entered into a contract in writing which supersedes all the oral negotiations concerning all of the 480 acres except for the NE ¼ SW ¼ of Section 21 which Leo, shortly after his father's death, permitted Rochus to farm by instrument dated November 17, 1954.

The contract in writing that we are speaking of is the lease which Francis gave Leo to the 440 acres on November 1, 1956, which expired on November 1, 1961. That lease contained a proviso that possession after November 1, 1961, by the lessee should not be construed to be a renewal of the lease, "but to be a tenancy at the will of the lessor which may be terminated upon thirty days' notice \* \* \*"

The trial court held, and we believe properly so, that N.D.C.C. § 9–06–07 is controlling. It reads:

9–06–07. Written contract supersedes oral negotiations.—The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.

North Dakota Century Code.

This statute has been applied in the following recent decisions of this court:

Watson v. Kresse, 130 N.W.2d 602, Syllabus ¶ 3 (N.D.1964);

First National Bank, Bismarck v. O'Callaghan, 143 N.W.2d 104, 106 (N.D. 1966);

Schue v. Jacoby, 162 N.W.2d 377, Syllabus ¶ 1 (N.D.1968).

■ It has been urged that this statute should not apply in this case because when Francis was cross-examined as to the reason for giving Leo the five-year lease, she merely said it was "only given." No authority has been referred to us in support of such a contention, nor do we find it persuasive.

■ It is further argued that because Francis could not guarantee that she would live five years, she was unable to give a five-year lease, and that thus the lease must be considered a lease for a lifetime rather than for any definite period of time. However, we reject this contention, as well. It would not be right that, having benefited from having a lease of the premises for five years, for purposes of securing an FHA loan, Leo now benefit by denying its definiteness and asserting that it is, instead, a lease for life, or by denying its validity for any purpose or for any period beyond 1961, and then contending the existence of an oral agreement for life.

■ Notwithstanding that we have confirmed the trial court in its decision that N.D.C.C. Section 9–06–07 controls in this case, because of Leo's urging we have considered (as witnessed by our review of the testimony set forth herein and our study of the rest of the testimony not so set forth) the parol evidence submitted on Leo's behalf and find it insufficient to establish the oral agreement contended by him.

■ In so doing, we have applied a rule used recently by this court in a case where, as here, specific performance of an oral contract was sought. Although in the case in mind, Tostenson v. Ihland, 147 N.W.2d 104 (N.D.1966), it was necessary to avoid the Statute of Frauds, and we have not in this case determined whether the Statute of Frauds applies, we do think one rule in that case applies here, and that is:

> The burden of proof rests on one who seeks to have a contract specifically performed to establish the terms of a contract upon which he relies which are essential to a decree of specific performance.

Tostenson v. Ihland, 147 N.W.2d 104, 113 (N.D.1966).

■ Should it be argued that the burden is less in proving an implied trust through parol evidence than in securing specific performance of an oral agreement, let us examine the case law relied upon by Leo. He refers us to the case of Shong v. Farmers & Merchants' State Bank, 70 N.W.2d 907 (N.D.1955). Although the facts in *Shong* are so different from the facts in this case that the conclusions in *Shong* are of no value in determining this case, we think that the rule therein stated relating to the burden of proof is pertinent.

> The courts are reluctant to ingraft a trust by parol on the legal title to real estate, and there is perhaps no better established doctrine than the one which requires a high degree of proof in order to establish the trust by parol evidence. 23 A.L.R. 1500, 1502 and cases cited; Carter v. Carter, 14 N.D. 66, 103 N.W. 425; Holler v. Amodt, 31 N.D. 11, 153 N.W. 465; Bernauer v. McCaull-Webster Elevator Co., 41 N.D. 561, 171 N.W. 282. These cases hold that the proof of an implied or resulting trust must be clear, specific, substantial, and satisfactory.

Shong v. Farmers & Merchants' State Bank, 70 N.W.2d 907, 911 (N.D.1955).

For a more recent case applying this rule see Severson v. Simon, 110 N.W.2d 289, 291 (N.D.1961).

■ Applying these rules and giving the trial court's findings appreciable weight, we find that Leo has failed to establish the terms of the alleged contract and that he has also failed to establish a basis for the imposition of a trust upon this property.

Although we have not summarized the evidence herein relating to improvements made by Leo on the 200 acres deeded to Leo or the evidence relating to seemingly divergent views expressed by Francis in her letters relative to who could farm the various pieces of land prior to and after the sales of remainder interests, we point out that we have examined this evidence and find it of no appreciable help in determining the issues of this case.

■ As for Issue No. 3 as to whether Leo is entitled to a decree establishing his right to share equally with the other children in his mother's estate, we conclude that the determination during his mother's life of such an issue is premature. This is also in accord with the trial court.

The law seems settled that neither specific performance nor the remedy in the nature of specific performance will be granted as to a breach of a contract to devise or bequeath during the lifetime of the promisor. 81 C.J.S. Specific Performance § 87 at 601. From her testimony conceding Leo's right to share equally with her other children in her estate when she dies, we find no such a repudiation as would justify action in this respect at this time. See 81 C.J.S. Specific Performance § 164 at 790.

The judgment of the trial court is therefore affirmed.

TEIGEN, C. J., and PAULSON, KNUDSON and STRUTZ, JJ., concur.